UNITED STATES DISTRICTCOURT
SOUTHERN DISTRICT OF NEW YORK

J.S.P.A., a minor, by and through his
next friend and attorney, Jocabed Rosario,

      Petitioner,

      v.

ROBERT F. KENNEDY, JR., *et al.*,

      Respondents.

Civil Action No. 26-CV-5903

VERNON S. BRODERICK
United States District Judge

**DECLARATION OF TOBY BISWAS**

Pursuant to 28 U.S.C. § 1746, I, Toby Biswas, hereby declare under penalty of perjury that the following is true and correct:

1.     I am the Assistant Deputy Director for Policy for the Unaccompanied Alien Children Bureau ("UACB") in the Office of Refugee Resettlement ("ORR"), an entity within the Administration for Children and Families ("ACF"), U.S. Department of Health and Human Services ("HHS").

2.     I have held various roles within ORR since joining the agency in November 2009, and I have held my current role since August 2025. My responsibilities encompass the development and implementation of ORR's policies and procedures concerning the care and custody of unaccompanied alien children ("UAC"). In this capacity, I am responsible for ensuring ORR's implementation of and compliance with programmatic policy prerogatives and statutory responsibilities, including those arising under the Homeland Security Act of 2002 ("HSA"), 6 U.S.C. § 279; Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232; and ORR's regulations, including the Foundational Rule, 45 C.F.R. part 410.

1

3.     This declaration is based upon my personal knowledge, information acquired in the course of performing my official duties, information contained in the records of ACF and ORR, and information conveyed to me by current agency employees and contractors.

**Care and Placement of Unaccompanied Alien Children in ORR Custody**

4.     An unaccompanied alien child is a child who has no lawful immigration status in the United States; has not attained 18 years of age; and with respect to whom there is no parent or legal guardian in the United States or no parent or legal guardian in the United States is available to provide care and physical custody. 6 U.S.C. § 279(g)(2).

5.     Pursuant to the TVPRA, "any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to the Secretary of Health and Human Services not later than 72 hours after determining that such child is an unaccompanied alien child." 8 U.S.C. § 1232(b)(3).  Therefore, ORR only takes children into its custody upon referral by another federal agency.

6.     ORR "shall accept referrals of unaccompanied children, from any department or agency of the Federal Government at any time of day, every day of the year."  45 C.F.R. § 410.1101(a).  Further, ORR has no ability to refuse a referral when the referring federal agency transfers custody to it of an individual that the other agency has determined to be a UAC.  *See generally* 8 U.S.C. § 1232(b).

7.     After a federal department or agency notifies ORR that a child in its custody is a UAC, ORR identifies a program placement for the child. 45 C.F.R. § 410.1101(b).  To do so, ORR requests background information from the referring federal agency to assess, among other things, whether the unaccompanied alien child is a danger to himself or others, whether there are any known medical and/or mental health issues, or whether other special concerns or needs are known.

2

ORR uses this information to determine an appropriate placement for the child in the least restrictive setting appropriate for the child's needs.  45 C.F.R. §§ 410.1103(a) & (b); ORR UACB Policy Guide ("UACB Policy Guide"), § 1.3.1, *available at* https://acf.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide.

8.      ORR may place a child in a shelter facility, foster home or group home (which may be therapeutic), heightened supervision facility or secure facility (including residential treatment centers), or other care facility that can provide for the UAC's specific individualized needs. 45 C.F.R. § 410.1102; UACB Policy Guide § 1.2.

### Policies for an Unaccompanied Alien Child's Safe and Timely Release

9.      ORR's goal is to release UACs to suitable sponsors where consistent with its statutory mandate to ensure that placement does not result in danger to UACs, to the community, or risk of flight by any UAC.  *See, e.g.*, 6 U.S.C. §§ 279(b)(1), (b)(2)(A)(ii); 8 U.S.C. §§ 1232(c)(1), (c)(3)(A).

10.      ORR must balance its responsibility to make and record prompt and continuous efforts towards release of UACs, *see* 45 C.F.R. § 410.1203(a), with concurrent duties to ensure the safety of releases for both the child and the community.

11.      The TVPRA prohibits ORR from releasing a child to a proposed custodian unless ORR first "makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being," which "shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." 8 U.S.C. § 1232(c)(3)(A).

12.      In addition, under its regulations, which implement the settlement agreement in

*Flores v. Reno*, No. CV 85-4544-RJK(Px) (C.D. Cal. Jan. 17, 1997) (the "*Flores* Settlement Agreement" or "FSA"),[1] ORR assesses all potential sponsors (even when the potential sponsor is a child's parent or legal guardian) before making any release determination, including a review of the potential sponsor's strengths, resources, risk factors, and relationship to the UAC. *See, e.g.*, 45 C.F.R. §§ 410.1201(a); 1202(b) & (c) (implementing Paragraphs 14 and 17 of the FSA, respectively).

13.    Further, as part of the sponsor suitability assessment process, "ORR shall evaluate the unaccompanied child's *current* functioning and strengths in conjunction with any risks or concerns such as: . . . (2) History of criminal or juvenile justice system involvement (including evaluation of the nature of the involvement, for example, whether the child was adjudicated and represented by counsel, and the type of offense) or gang involvement." 45 C.F.R. § 410.1202(f) (emphasis added).

14.    The sponsor assessment process is particularly important because ORR is not a law or immigration enforcement agency and lacks the authority to hold individuals accountable by reassuming care of the child if the sponsor abuses or neglects a child after the child has been released from ORR custody. Instead, ORR only takes children into its custody upon referral by another federal agency, as described in statute. In this regard, ORR is also very different from state child welfare agencies, which typically retain such authority post-placement. Accordingly, ORR must front-load child safety considerations in its identity verification and sponsor-vetting policies.

---

[1] The *Flores* Settlement Agreement is a consent decree entered into by the former Immigration and Naturalization Service ("INS") governing the apprehension, process, and care and custody of alien minors in its custody. The Department of Homeland Security and HHS are successor agencies to the former INS with respect to various parts of the FSA. However, the FSA has been mostly terminated as to HHS. *See Flores v. Garland*, No. CV 85-4544-DMG (AGRx), 2024 WL 3467715, at *9 (C.D. Cal. June 28, 2024) (conditionally and partially terminating the FSA as to HHS on the basis of ORR's publication of regulations implementing the Agreement). The few remaining paragraphs of the FSA that still apply to HHS do not pertain to ORR release processes (*e.g.*, sponsor vetting processes).

15.     The process for the safe and timely release of an unaccompanied alien child from ORR custody involves several steps, including: the identification of sponsors; sponsor application; interviews; the assessment (evaluation) of sponsor suitability, including verification of the sponsor's identity and relationship to the child (if any), background checks, and in some cases home studies; and post-release planning. *See generally* 45 C.F.R. part 410, subpart C. Also, under ORR sub-regulatory guidance, there are three categories of potential sponsors: (1) Category 1, consisting of parents or legal guardians; (2) Category 2, consisting of siblings, half-siblings, grandparents, or immediate relatives (such as aunts, uncles, and cousins), and other biological relatives and relatives through marriage; (3) Category 3, consisting of other sponsors, such as distant relatives and unrelated adult individuals. Additionally, ORR classifies cases as Category 4 when no sponsor has been identified. *See* UACB Policy Guide § 2.2.1.

16.     A potential sponsor must complete a sponsorship application package to be considered as a sponsor. 45 C.F.R. § 410.1202. The sponsor must provide unexpired government-issued identification documentation for the sponsor and any other adults living in the household or identified in a sponsor care plan; and, along with any adult living in his or her household, undergo background checks. UACB Policy Guide §§ 2.2.4, 2.5. All potential sponsors must also submit proof of address, income, sponsor-child relationship, and criminal history documents (if applicable). *Id.* § 2.2.4. ORR does not disqualify potential sponsors based solely on their immigration status or for law enforcement purposes. *Id.* § 2.6.

17.     With respect to the background check process, Title VIII, Section 8701(b)(1) of the One Big Beautiful Bill provides ORR funds for background checks on potential sponsors, "which *shall* include: (A) the name of the potential sponsor and of all adult residents of the potential sponsor's household; (B) the social security number or taxpayer identification number of the potential sponsor and of all residents of the potential sponsor's household; . . . ." (emphasis added).

18.    ORR conducts a suitability assessment of the potential sponsor, including a review of the sponsor's strengths, resources, risk factors, and special concerns within the context of each child's needs, strengths, risk factors, and relationship to the sponsor. *See* 45 C.F.R. § 410.1202. Additionally, in certain circumstances a home study, which consists of interviews, a home visit, and a written report containing the home-study case worker's findings, is performed. *See* 45 C.F.R. § 410.1204; UACB Policy Guide § 2.4.2.

19.    The TVPRA provides ORR with the authority to conduct home studies, and states: "A home study *shall* be conducted for a child who is a victim of a severe form of trafficking in persons, a special needs child with a disability (as defined in Section 12102 of Title 42), a child who has been a victim of physical or sexual abuse under circumstances that indicate that the child's health or welfare has been significantly harmed or threatened, or a child whose proposed sponsor clearly presents a risk of abuse, maltreatment, exploitation, or trafficking to the child based on all available objective evidence." 8 U.S.C. § 1232(c)(3)(B) (emphasis added); *see also* 45 C.F.R. § 410.1204(b)(1).

20.    Additionally, per 45 C.F.R. § 410.1204(b)(2)&(3), ORR requires a home study "[b]efore releasing any child to a non-relative sponsor who is seeking to sponsor multiple children, or who has previously sponsored or sought to sponsor a child and is seeking to sponsor additional children. ORR also requires a home study "[b]efore releasing any child who is 12 years old or younger to a non-relative sponsor." *Id.*

21.    Under 45 C.F.R. § 410.1204(c), ORR may also initiate home studies if it determines that a home study is likely to provide additional information which could assist in determining that the potential sponsor is able to care for the health, safety, and well-being of the child.

22.    On February 4, 2025, former Acting Director of ORR, Mellissa Harper, issued a

6

memorandum ("Harper Memo") outlining immediate changes to address ongoing concerns with gaps in ORR's sponsor vetting process, as well as fraud and trafficking. The memorandum highlighted one particularly egregious instance of sponsor fraud, where a potential sponsor had obviously photoshopped himself into a photograph to establish kinship with the child. Subsequently, that same potential sponsor presented a foreign identification card bearing the name and photograph of another individual in an attempt to establish his identity and sponsor another child. In another example regarding age fraud, a UAC killed his sponsor months after he was released from ORR care. It was later discovered during a law enforcement investigation that the UAC was actually 23 years old at the time of the murder and thus, despite successful efforts to convince ORR to the contrary, had not been a child at the point he was in ORR custody. In the memorandum, former Acting Director Harper specifically cited the results of the aforementioned investigations as the rationale for implementing immediate policy changes, which include mandatory enhanced biometric collection and background checks, reassessment of the use of secondary documents that cannot be reliably verified as proof of identity, and sponsor presentation of original documents in-person. The Harper Memo noted that the average length of care, which at the time was 25.8 days, did not permit ORR to conduct the adequate sponsor vetting measures necessary to ensure that children are not released into potentially dangerous situations like the ones detailed in the numerous investigations.

23. In response to the Harper Memo, on February 14, 2025, ORR issued Field Guidance ("FG") 26 which requires all potential sponsors, their adult household members aged 18 and above, and all adult caregivers identified in a Sponsor Care Plan to undergo national fingerprint-based FBI background checks. FG 26 also restricts the acceptable list of identification to only unexpired and legible photocopies or high-resolution digital scans/photos of identification documents for establishing identity purposes. These sponsor vetting changes directly support ORR's efforts to

7

combat sponsor fraud and mitigate risk of human trafficking of unaccompanied alien children by: requiring the same identity document be used as part of the sponsorship application, the fingerprint application, and at discharge; ensuring that acceptable identity documents are easily validated as expired documents or unoriginal copies are not able to be consistently authenticated by issuing agencies; and re-establishing universal FBI fingerprints for all sponsors, a policy that was in place prior to 2018 – ensuring equity in background information available for each sponsor as part of the totality of circumstances assessment conducted by ORR in making release decisions.

24.     On March 7, 2025, in alignment with ORR's statutory and regulatory requirements (*see* 8 U.S.C. § 1232(c)(3)(A) and 45 C.F.R. § 410.1202) and to address identified gaps in the reporting of fraud incidents to HHS Office of the Inspector General ("HHS OIG"), ORR updated its UACB Policy Guide Sections 2.2.4, 2.7.4, and 5.8.2 to broadly align the acceptable identity documents for identity verification purposes with the standards used for I-9 verifications as a safer framework to mitigate reliance on foreign-issued identity documents, and establish clear protocols for detecting, documenting, and responding to fraud, including preventing fraudulent actors from exploiting the UAC Bureau and UAC for trafficking or other forms of exploitation.

25.     In further justification of this revision, ORR stated, in an accompanying decision memo, that while its former policies permitted the acceptance of a wide variety of identity documents, including many foreign-issued documents, ORR has encountered difficulties authenticating foreign-issued documents, especially in a timely manner. ORR is aware of widespread fraud involving the use of such documents and has had to rely on foreign consulates and embassies, often liaising with the Department of State, to authenticate documents issued outside the United States. This process is complicated by international relations (including whether the United States maintains diplomatic relations with certain countries) and the stability of certain foreign states. Therefore, to address concerns regarding sponsor fraud involving identity

documents, ORR's revised policy relies on documents that the federal government relies on to establish identity for both citizens and non-citizens. In consideration of family reunification, the policies contemplate an exception for Category 1 sponsors on a case-by-case basis.  Regarding proof of address documentation, ORR has previously released children to addresses that did not include apartment numbers or were themselves suspected to be fraudulent; resulting in children being released to locations that may not have been actual residences or for which the specific residential unit is unknown.  Regarding sponsor denial criteria, ORR clarified that sponsor or adult household member refusal to present for fingerprinting would be sufficient for denial of release as failure to present can be an indication that the individual is trying to conceal known biometrics or criminal history, which could themselves be grounds for sponsorship denial.

26.     As part of the sponsor vetting process, "[i]n-person vetting is conducted to verify the potential Sponsor's identity, validate sponsor application supporting documentation, gather additional information to inform the Sponsor Assessment, and confirm the validity of information provided during earlier stages in the sponsor vetting process."  UACB Field Guidance ("UACB Field Guidance"), 24, *available at* https://acf.gov/orr/policy-guidance/uc-program-field-guidance.

27.     Once the assessment of the potential sponsor is complete, ORR makes a release determination. UACB Policy Guide § 2.7. The determination must take into consideration all relevant information, including the report and recommendations from a home study, if conducted, laws governing the process, and other facts in the case. ORR makes the final release decision. *Id*. Release decisions include: (1) approve release to sponsor; (2) approve release with post-release services; (3) conduct a home study before a final release decision; (4) deny release; or (5) remand for further information. *Id*.

28.     In   making   that   determination,   "[t]he   DSA-FFS   [Division   of   Sponsor Administration Federal Field Specialist], Division of Case Administration Federal Field Specialist

9

[DCA-FFS], Care Provider Case Manager, and the Case Coordinator collaborate on the Release Request process, which must be informed by the findings of the DSA-FFS Suitability Determination and the Sponsor Assessment. DCA-FFS consider DSA Suitability Determination and the totality of the UAC case for their final release decision." UACB Field Guidance  24.

29.    In general, ORR denies release if: (1) the potential sponsor is not willing or able to provide for the child's physical or mental well-being; (2) the potential sponsor is not willing to complete the mandatory fingerprint check; (3) the physical environment of the home presents a risk to the child's safety or well-being; or (4) release of the UAC would present a risk to him or herself, the sponsor, household, or community. *Id*. § 2.7.4; 45 C.F.R. § 410.1205.

30.    In making placement decisions, ORR "may consider danger to self, danger to the community, and risk of flight." 8 U.S.C. § 1232(c)(2)(A).  If the sole reason for the denial of release is a concern that the UAC is a danger to themself or others, ORR shall send the UAC and their counsel (if the UAC is represented by counsel) a copy of the Notification of Denial and the child may seek an appeal of the denial.  45 C.F.R. § 410.1205(f).

31.    Separately, the UAC, or their parent, or legal guardian, can request a risk determination hearing before an independent HHS hearing officer. *See* 45 C.F.R. § 410.1903. All UACs in restrictive placements based on a finding of dangerousness shall be afforded a hearing before an independent HHS hearing officer who determines, through a written decision, whether the UAC would present a risk of danger to self or to the community if released, unless the UAC indicates in writing that they refuse such a hearing. 45 C.F.R. § 410.1903(a).  UACs placed in restrictive settings shall receive a written notice of the procedures. *Id.*  Additionally, all other UACs in ORR custody may request a hearing to determine, through written decision, whether the UAC would present a risk of danger to themself or to the community if released. 45 C.F.R. § 410.1903(b).  However, "[d]eterminations made under [45 C.F.R. § 410.1903] will not compel an

unaccompanied child's release; nor will determinations made under [45 C.F.R. § 410.1903] compel transfer of an unaccompanied child to a different placement.  Regardless of the outcome of a risk determination hearing or appeal, an unaccompanied child may not be released unless ORR identifies a safe and appropriate placement pursuant to [45 C.F.R. §§ 410.1200-1210]; and regardless of the outcome of a risk determination hearing or appeal, an unaccompanied child may only be transferred to another placement by ORR pursuant to requirements set forth at [45 C.F.R. §§ 410.1100-1109 and 45 C.F.R. §§ 410.1600-1601]." 45 C.F.R. § 410.1903(j).

32.     A Notification of Denial letter issued to a potential sponsor will inform the sponsor that they have the right to request an appeal of the denial to the Departmental Appeals Board ("DAB") (as the Assistant Secretary's designee who is a neutral and detached decision maker) and includes instructions for doing so. 45 C.F.R. § 410.1205(c)(3).  In deciding an appeal of a release denial, the DAB's role (as the Assistant Secretary's neutral and detached designee) is not to substitute its judgment for that of ORR, but to determine whether ORR acted within its statutory authority and applied its regulations and policies reasonably, and whether its decision to deny release was supported by substantial evidence.  *See* 45 C.F.R. § 1206; ORR UACB Policy Guide § 2.7.4.

33.     The DAB's decision (as the Assistant Secretary's designee) to affirm or overrule ORR's decision to deny release to a potential sponsor is the final administrative decision of the agency on the application that had been under consideration. *See* ORR UACB Policy Guide § 2.7.4. However, if there is new information or a change in circumstances regarding the reunification application, or regarding the unaccompanied alien child's circumstances, a new reunification application may be submitted that highlights the change(s) and explains why such changes should alter the initial decision. *Id.*  Similarly, if ORR discovers new information or becomes aware of a change in circumstances of the potential sponsor and/or the unaccompanied

11

alien child, ORR may assess the case anew. *Id.*

34. Additionally, to ensure due process rights and protect the best interests of children in ORR care, a prior release denial of an individual's sponsor application does not mean ORR will automatically deny their future sponsor application. *Id.* "In making a release decision, ORR will consider the totality of circumstances surrounding a sponsor application, that is, all information gathered related to the sponsor's relationship to and ability to care for the child." *Id.*

35. ORR does not have a "re-referral" policy for children who are referred again to ORR by DHS after a previous release. Months or years might have elapsed since the prior determination. The statute provides that HHS through ORR has to make a sponsor suitability assessment before ORR can release a child to a sponsor. *See* 8 U.S.C. § 1232(c)(3). ORR applies the same requirements (as described in regulations and sub-regulatory guidance) to release for all UAC in its custody, including to the named plaintiff in this litigation. Thus, the applicable policies for re-referrals are contained within 45 C.F.R. §§ 410.1200-410.1210, as set forth above.

### Case Status for J.S.P.A.

36. J.S.P.A. is a citizen of El Salvador.

37. On August 15, 2024, J.S.P.A. was apprehended by Border Patrol at the Southern Border near Del Rio, Texas, and referred to ORR care on that day.

38. On September 7, 2024, J.S.P.A. was released from ORR custody to his father, a Category 1 Sponsor. ORR verified the relationship between J.S.P.A. and his father, successfully completed the vetting of J.S.P.A.'s father and determined that J.S.P.A. was not a danger to himself or the community.

39. On May 14, 2025, J.S.P.A. was arrested and charged in the Commonwealth of Massachusetts, with two counts of Massachusetts General Law ("G.L.c.") 265 § 15B: Assault with

a dangerous weapon. This arrest was in relation to an incident that occurred earlier that day at the school J.S.P.A. attended, Chelsea High School. J.S.P.A. and two apprehended others, approached two students in the bathroom, Juvenile Victim 1 ("JV1") and Juvenile Victim 2 ("JV2"), where J.S.P.A. displayed a switch blade and made lunging motions towards JV1 and JV2, while stating "que pedo," a term that translates to "what's up." The above-mentioned actions of J.S.P.A. caused JV1 to stumble and fall down while he was exiting the bathroom.

40. On May 14, 2025, U.S. Immigration and Customs Enforcement (ICE) referred J.S.P.A. to ORR's care following his criminal arrest.

41. On May 15, 2026, J.S.P.A. was admitted to ORR custody and placed at Children's Village under a heighted supervision level of care, given the pending criminal charges against him, pursuant to 45 C.F.R. § 410.1105(a)(3)(i). A heightened supervision facility is a facility "[that] may have a secure perimeter but shall not be equipped internally with major restraining construction or procedures typically associated with juvenile detention centers or correctional facilities." ORR UACB Policy Guide: Guide to Terms, *available at* https://acf.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-guide-terms. Given the seriousness of the criminal allegations, for the safety of J.S.P.A. and other UAC in ORR care, ORR determined that it was appropriate to place J.S.P.A. in a secure program until ORR could more thoroughly observe J.S.P.A. and make further assessments.

42. For UAC placed in a restrictive placement, like J.S.P.A.'s placement in a heightened supervision level of care, ORR is required to review that placement every 30 days pursuant to 45 C.F.R. § 410.1103(d), and determine whether a new level of care is appropriate.

43. On May 15, 2025, J.S.P.A.'s father was identified as a potential Category 1 sponsor and an ORR case manager had an initial telephone call with J.S.P.A.'s father, during which the

sponsorship vetting process was explained.

44.    On May 22, 2025, J.S.P.A.'s father submitted supporting documentation as part of the vetting process, including a copy of his driver's license.  Later in May 2025, J.S.P.A.'s father submitted birth certificates and proof of address.

45.    On May 28, 2025, ORR completed a public records check of J.S.P.A.'s father and he was scheduled for fingerprinting.  On May 29, 2025, fingerprinting was completed and the results were negative.

46.    On May 27, 2025, J.S.P.A. had a clinical evaluation and was diagnosed with unspecified adjustment disorder and prescribed psychotropic medication.  Since J.S.P.A.'s reentry into ORR's care, J.S.P.A. has obtained regular mental health treatment and evaluation.

47.    On June 15, 2025, as a part of the 30-day review pursuant to 45 C.F.R. § 410.1103(d), ORR placed J.S.P.A. on a lower level of supervision at Children's Village, based on the information known by ORR at that time, including J.S.P.A.'s statement to his case manager on May 16, 2025, that "he was not directly involved, but assumed to be associated to presence at the scene" at Chelsea High School on May 14, 2025.  At that time, J.S.P.A. did not meet the requirements for continued placement in a heightened supervision level of care.  *See* ORR UACB Policy Guide § 1.2.4.

48.    On June 15, 2025, J.S.P.A. was admitted to a shelter-level program.  A shelter-level program is "[a] kind of standard program in which all of the programmatic components are administered on-site, consistent with the standards set forth in 45 C.F.R. § 410.1302. Shelters are considered a least restrictive environment." ORR UACB Policy Guide: Guide to Terms.  To date, J.S.P.A. remains at a shelter-level program.

49.    On September 22, 2025, J.S.P.A.'s legal service provider informed ORR that the

14

Commonwealth of Massachusetts declined to prosecute J.S.P.A.'s criminal charges from May 14, 2025, dismissing said charges.

50.     While in ORR custody, J.S.P.A. has demonstrated a series of behavioral incidents at ORR.

51.     On June 10, 2025, J.S.P.A. had a verbal altercation with a peer while playing pool. A Child Level Event incident report detailing that event states "[J.S.P.A.] proceeded to make an attempt to physically strike" the peer.  The report noted that staff intervened immediately to prevent further escalation.  When questioned by staff, J.S.P.A. stated the peer was aggressive and threatening, and denied attempting to strike the peer. A Child Level Event incident report is prepared to document "[i]ncidents, events, or observations that affect the health, safety, and wellbeing of individual children and include emergency incidents, significant incidents, behavioral notes, and historical disclosures." ORR UACB Policy Guide: Guide to Terms.

52.     On August 29, 2025, J.S.P.A. initiated a physical altercation by lunging at another UAC and J.S.P.A. and the other UAC hit each other.  A Child Level Event incident report was created detailing the incident.

53.     On October 31, 2025, J.S.P.A. made threatening gestures towards a peer through the window.  Staff redirected J.S.P.A. away from the window.  J.S.P.A. asked a staff member if he could use the restroom, to which he was told that he needed to wait due to safety reasons.  J.S.P.A. responded, "[y]ou whore, I told you to take me to the bathroom." A Child Level Event incident report was created detailing the incident.

54.     On December 28, 2025, J.S.P.A. was in the bathroom at Children's Village with a peer from approximately 2 A.M. until 3 A.M.  J.S.P.A. stated to staff that he received an ear piercing while he was in the bathroom during that time. Staff redirected J.S.P.A. to return to his

bedroom to comply with the sleeping-time expectations, and J.S.P.A. refused.  A Child Level Event incident report was created detailing the incident.

55.    On January 29, 2026, J.S.P.A. was transferred to the care of Catholic Guardian University Residence Shelter in Bronx, New York.

56.    On January 31, 2026, while waiting for a transport van, staff at Catholic Guardian University Residence Shelter heard J.S.P.A. say to a peer, "look we can escape from here."  A Child Level Event incident report was created detailing the incident.

57.    On February 1, 2026, J.S.P.A. stated to his assigned mental health clinician at Catholic Guardian University Residence Shelter, "[t]he staff [at Children's Village] were afraid of me, and I could get whatever I wanted from them" and ". . . I worked things for my benefit.  When I wanted staff to do something for me, I blackmailed them with their jobs."  J.S.P.A. further stated, "I would tell the staff: your job or my marijuana, and they would get me marijuana because I knew things about their lives that could harm their jobs," and "there were staff who did not get along and I used that to my benefit.  Staff who did not get along with other staff would come and tell me personal things about other staff, and I used that to blackmail them to get what I wanted, like marijuana." A Child Level Event incident report was created detailing the disclosure made.

58.    On February 1, 2026, J.S.P.A. stated to his assigned mental health clinician in reference to the incident that occurred on May 14, 2025, at Chelsea High School: ". . . I had the intention of killing that guy at school.  He survived because he escaped from the hands of my other friend."  J.S.P.A. further explained, "[t]he guy owed me, and whoever does something pays for it. He survived because he struggled, broke free, and ran out of the bathroom, and when I went to stab him with the knife, my friend did not hold him well."  J.S.P.A. also stated: "[t]hen I left the bathroom and put the knife where no one could or would find it."  Finally, he explained, ". . . I did

everything where there were no cameras, that's why they dismissed the case." The assigned clinician "notified leadership management immediately." A Child Level Event incident report was created detailing the disclosure made.

59. On February 9, 2026, Catholic Guardian University Residence Shelter recovered a walkie-talkie from J.S.P.A. during an inspection of his bedroom. The walkie-talkie was property of the school J.S.P.A. attended and he was not permitted to possess it. Additionally, staff recovered from J.S.P.A.'s bedroom a plastic bag containing $78 United States currency, which was concealed in a bottle of conditioner. A Child Level Event incident report was created detailing the incident.

60. On February 16, 2026, J.S.P.A. engaged in a verbal dispute with an ORR peer. and stated to the peer: "[s]top messing around, what you really want is to get your ass kicked." A Child Level Event incident report was created detailing the incident.

61. As reflected above, from June 2025 to February 2026, ORR documented more than 10 incidents where J.S.P.A. showed verbal or physical aggression towards his peers, threatened program staff or was found in possession of contraband. J.S.P.A.'s behavioral incidents from June 2025 to February 2026 contributed to ORR's decision to deny release.

62. In compliance with the updated policies set forth in the UACB Field Guidance that required in person identification verification for sponsorship vetting starting in July 2025, an ORR case manager contacted J.S.P.A.'s father to schedule an appointment for in-person identification verification. On November 17, 2025, the father declined scheduling an appointment as he did not wish to appear at a Federal building and expressed his desire to withdraw as a potential sponsor. To date, J.S.P.A.'s father has not completed the sponsorship requirement of having his identification verified by ORR.

63. On May 29, 2026, ORR issued a letter denying release of J.S.P.A. to his father

17

because ORR determined that J.S.P.A. posed a risk of danger to himself or the community.  ORR's decision was based on the totality of the information available including: information gathered during the sponsorship application process, J.S.P.A.'s pattern of physical and verbal aggression at ORR; J.S.P.A.'s psychiatric evaluations reflecting continued diagnoses of unspecified adjustment disorder and ongoing mental health symptoms; and J.S.P.A.'s criminal arrest on May 14, 2025 and subsequent statements J.S.P.A. made to an ORR clinician regarding the incident.

64.    ORR noted in its denial letter issued on May 29, 2026, the danger in releasing J.S.P.A. back into the community where he, based on his own admission, had intended to kill a schoolmate. ORR determined that notwithstanding J.S.P.A.'s dismissed criminal charges in Massachusetts, J.S.P.A.'s statements to ORR staff regarding the May 14, 2025, criminal arrest, demonstrated deeply troubling thinking and behavior. Moreover, ORR determined that J.S.P.A. remained a danger to the community or himself due to his behavioral incidents, and ongoing pattern of aggression towards staff and peers at both Children's Village and Catholic Guardian University Residence Shelter.  The letter provided J.S.P.A.'s father a right to appeal the release denial decision to the Departmental Appeals Board (DAB) under 45 C.F.R. § 410.1205(c).

65.    A subsequent Notification of Denial of Release was issued to J.S.P.A. and his legal services provider.  That notification letter served as a formal notice of the denial of J.S.P.A.'s release.  It explained that the decision was based on the determination that J.S.P.A. presented a risk of danger to himself or the community.  The notification informed J.S.P.A. of his right to appeal the release denial to the DAB under 45 C.F.R. § 410.1205(c).  The letter also informed J.S.P.A. of his right to request a risk determination hearing under 45 C.F.R. § 410.1903(b).

66.    To date, neither J.S.P.A. nor his father requested a risk determination hearing pursuant to 45 C.F.R. § 410.1903(b), or an appeal of the release denial to the DAB under 45 C.F.R. § 410.1205(.

67.     On July 13, 2026, J.S.P.A., during a clinical evaluation, "chose to discontinue the prescribed medication and declined continued psychiatric follow-up."

I hereby declare under the penalty of perjury that the above statements are true and correct.

Executed this 24th day of July 2026

TOBY R.
BISWAS -S

Digitally signed by TOBY
R. BISWAS -S
Date: 2026.07.24 16:48:44
-04'00'

Toby Biswas
Assistant Deputy Director for Policy
Unaccompanied Alien Children
Bureau Office of Refugee Resettlement