UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

J.S.P.A.,

                    Petitioner,

     - against -

ROBERT F. KENNEDY JR., *et al.*,

                   Respondents.

**No. 26 Civ. 5903 (VSB)**

# RESPONDENTS' MEMORANDUM OF LAW IN OPPOSITION TO THE PETITION FOR A WRIT OF HABEAS CORPUS

JAY CLAYTON
United States Attorney for the
Southern District of New York
*Attorney for Respondents*
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel: (212) 637-2696

ERICA A. SILVERMAN
Assistant United States Attorney
   – Of Counsel –

**TABLE OF CONTENTS**

**PAGE**

PRELIMINARY STATEMENT ..........................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND..................................................................2

      A.     Petitioner's Unlawful Entry and Initial Placement into ORR Custody ...................2

      B.     Petitioner's Criminal Arrest and Re-Placement into ORR Custody.......................2

      C.     Petitioner's Behavioral Incidents at ORR..............................................................4

      D.     ORR's Decision to Deny Release ...........................................................................6

      E.     Petitioner's Habeas Petition...................................................................................7

LEGAL FRAMEWORK ....................................................................................................7

      1.     Statutory and Regulatory Background.............................................................8

      2.     The Unaccompanied Children Program Foundational Rule.......................9

      3.     ORR's Release to Sponsor Policies and Practices.....................................10

      4.     Updated ORR Guidance Regarding UAC Sponsor Vetting in 2025 .........12

      5.     Return of Previously Released UAC to ORR Custody..............................13

      6.     Denial Appeal Process ................................................................................14

ARGUMENT..................................................................................................................16

      I.     Petitioner Should be Required to Exhaust His Administrative Remedies
             that the Departmental Appeal Board ("DAB") Provides.....................................17

      II.    Petitioner's Denial of Release from ORR Custody Does Not Violate Due
           Process ................................................................................................................19

             *a.*     *ORR's Delay in its Sponsorship Determination Was Due to the
                  Vetting Process Required*..............................................................19

             *b.*     *ORR's Determined that Petitioner Presented a Danger to Himself
                  and the Community*...................................................................19

             *c.*     *ORR's Custody Determination Does Not Violate Procedural Due
                  Process*......................................................................................22

        *d.*     *Petitioner's Substantive Due Process Claims are Without Merit*..............24

III.    Petitioner's Continued Detention in ORR Custody Does not Violate the Flores Settlement Agreement....................................................................................24

IV.    Petitioner's Administrative Procedure Act and *Accardi* Claims Fail ....................26

CONCLUSION................................................................................................................................27

## TABLE OF AUTHORITIES

**CASES**                                                                                                                        **PAGE(s)**

*A.N.P.S. v. Salazar,*
  2025 WL 3707333 (N.D. Ill. Dec. 22, 2025) ...................................................... 16, 20, 23

*Abbey v. Sullivan,*
  978 F.2d 37 (2d Cir. 1992)....................................................................................... 17

*Beharry v. Ashcroft,*
  329 F.3d 51 (2d Cir. 2003)....................................................................................... 17

*C.G.B. v. Wolf,*
  464 F. Supp. 3d 174 (D.D.C. 2020) ........................................................................ 26

*Chong v. INS,*
  264 F.3d 378 (3d Cir. 2001)..................................................................................... 26

*Columbia Broad. Sys., Inc. v. United States,*
  316 U.S. 407 (1942)................................................................................................. 26

*Cty. of Sacramento v. Lewis,*
  523 U.S. 833 (1998)................................................................................................. 23

*DHS v. Zadvydas,*
  533 U.S. ................................................................................................................... 21

*Diego N. et al., v. U.S. Dep't of Health and Human Services, et al.,*
  2026 WL 1179706 (D.D.C. Apr. 30, 2026) ............................................................ 21

*E.F.E.L. v. Noem,*
  2026 WL 1045550 (N.D. Ill. Apr. 17, 2026) ..................................................... 16, 20

*Flores v. Garland,*
  2024 WL 3467715 ................................................................................................... 24

*Flores v. Lynch,*
  828 F.3d 898 (9th Cir. 2016) .................................................................................. 35

*Imon v. Keeton,*
  2020 WL 4284378, n.12 (D. Ariz. July 27, 2020)........................................................ 16

*Leslie v. Att'y Gen. of U.S.,*
  611 F.3d 171 (3d Cir. 2010)..................................................................................... 26

*Lucas R v. Becerra*,
    2022 WL 2177454 (C.D. Cal. Mar. 11, 2022) ................................................................. 15

*Maldonado v. Lloyd*,
    2018 WL 2089348 (S.D.N.Y. May 4, 2018) ........................................................... 16, 22

*Mathews v. Diaz*,
    426 U.S. 67 (1976) ................................................................................................... 21

*Mendez Ramirez v. Decker*,
    612 F. Supp. 3d 200 (S.D.N.Y. 2020) ......................................................................... 13

*Michalski v. Decker*,
    279 F. Supp. 3d 487 (S.D.N.Y. 2018) ......................................................................... 16

*Norton v. Southern Utah Wilderness Alliance*,
    542 U.S. 55 (2004) ................................................................................................... 25

*Paz Nativi v. Shanahan*,
    2017 WL 281751 (S.D.N.Y. Jan. 23, 2017) ............................................................... 16

*Reno v. Flores*,
    507 U.S. 292 (1993) ..................................................................................... 18, 21, 22

*Santosky v. Kramer*,
    455 U.S. 745 (1982) ..................................................................................... 16, 20, 22

*Saravia v. Sessions*,
    280 F. Supp. 3d 1168 (N.D. Cal. 2017) ...................................................................... 20

*Trump v. J.G.G.*,
    604 U.S. 670 (2025) ................................................................................................. 25

*United States ex rel. Accardi v. Shaughnessy*,
    347 U.S. 260 (1954) ................................................................................................. 26

*United States v. Salerno*,
    481 U.S. 739 (1987) ................................................................................................. 23

**STATUTES**

5 U.S.C. § 704 ................................................................................................................. 25

5 U.S.C. § 706(1) ........................................................................................................... 25

6 U.S.C. § 279 ................................................................................................................... 7

6 U.S.C. § 279(a) .................................................................................................... 7

6 U.S.C. § 279(b)(1) ............................................................................................... 7

6 U.S.C. § 279(g)(2) ............................................................................................... 7

8 U.S.C. § 1232(b) ............................................................................................ 8, 10

8 U.S.C. § 1232(c) .................................................................................................. 8

8 U.S.C. § 1232(c)(2) ..................................................................................... *passim*

8 U.S.C. § 1232(c)(3)(A) ............................................................................... *passim*

31 U.S.C. § 6305 .................................................................................................. 10

Pub. L. No. 107-296 ............................................................................................... 9

Pub. L. No. 110-457 ............................................................................................. 11

## REGULATIONS

45 C.F.R. § 410.1003 .............................................................................................. 9

45 C.F.R. § 410.1103(d) ................................................................................. *passim*

45 C.F.R. § 410.1200 ...................................................................................... 12, 24

45 C.F.R. § 410.1201 .............................................................................................. 9

45 C.F.R. § 410.1202(a) .......................................................................................... 9

45 C.F.R. § 410.1202(b) ........................................................................................ 23

45 C.F.R. § 410.1202(f) .......................................................................................... 9

45 C.F.R. § 410.1205(c)(3) ............................................................................. 24, 25

45 C.F.R. § 410.1205(f) .................................................................................. *passim*

45 C.F.R. § 410.1206 ..................................................................................... *passim*

45 C.F.R. § 410.1206(c) .................................................................................. 18, 25

45 C.F.R. § 410.1903 ............................................................................................ 17

45 C.F.R. § 410.1903(b) .................................................................................. 1, 2, 7

Respondents (the "government"), by their attorney, Jay Clayton, United States Attorney for the Southern District of New York, respectfully submit this memorandum of law in opposition to the petition for a writ of habeas corpus (ECF No. 1) ("Pet."), filed on July 13, 2026, by petitioner J.S.P.A. ("Petitioner").

## PRELIMINARY STATEMENT

Petitioner is a minor who is in the care of the Office of Refugee Resettlement ("ORR"), an entity within the Administration for Children and Families ("ACF"), a division of the U.S. Department of Health and Human Services ("HHS"). On August 15, 2024, Petitioner was apprehended by Border Patrol at the Southern Border, near Del Rio, Texas, and transferred into ORR custody on that day. On September 7, 2025, Petitioner was released from ORR custody to his father, after ORR successfully vetted Petitioner's father as a sponsor and determined that Petitioner was not a danger to himself or the community. On May 14, 2025, Petitioner was arrested and charged with assault with a dangerous weapon in Massachusetts, and Immigration and Customs Enforcement ("ICE") referred Petitioner to ORR's care.

From May 15, 2025, to May 29, 2026, ORR worked with Petitioner's father to begin the reunification process and required sponsor vetting. On May 29, 2026, ORR denied release of Petitioner to his father as a sponsor, due to its determination that Petitioner would present a danger to himself and the community if released from ORR custody. ORR made this determination based on Petitioner's criminal arrest, and subsequent statement that he intended to kill a schoolmate, and series of behavioral incidents while in ORR custody. ORR issued Petitioner's father a denial letter, which provided Petitioner's father the right to appeal the release denial decision to the Departmental Appeals Board (DAB) under 45 C.F.R. § 410.1205(f). A subsequent letter also detailed the right to a risk determination hearing under 45 C.F.R. § 410.1903(b). Neither Petitioner

nor his father requested a risk determination hearing pursuant to 45 C.F.R. § 410.1903(b), or an appeal of the release denial to the DAB under 45 C.F.R. § 410.1205(f)

**FACTUAL AND PROCEDURAL BACKGROUND**

**A.      Petitioner's Unlawful Entry and Initial Placement into ORR Custody**

Petitioner is a citizen of El Salvador. Declaration of Toby Biswas ("Biswas Decl.") ¶ 36. On August 15, 2024, Petitioner was apprehended by Border Patrol at the Southern Border near Del Rio, Texas, and referred to ORR care on that day. Biswas Decl. ¶ 37. On September 7, 2024, Petitioner was released from ORR custody to his father, a Category 1 Sponsor. Biswas Decl. ¶ 38. At that time, ORR verified the relationship between J.S.P.A. and his father, successfully completed the vetting of J.S.P.A.'s father, and determined that J.S.P.A. was not a danger to himself or the community.  Biswas Decl. ¶¶ 38; 43-45.

**B.      Petitioner's Criminal Arrest and Re-Placement into ORR Custody**

On May 14, 2025, Petitioner was arrested and charged in the Commonwealth of Massachusetts, with two counts of Massachusetts General Law ("G.L.c.") 265 § 15B: Assault with a dangerous weapon. Biswas Decl. ¶ 39; Gov't Return Ex. A. (Police Report).[1]  This arrest was in relation to an incident that occurred earlier that day at the school Petitioner attended, Chelsea High School. Petitioner and two others approached two students in the bathroom, Juvenile Victim 1 ("JV1") and Juvenile Victim 2 ("JV2"), where Petitioner displayed a switch blade and made lunging motions towards JV1 and JV2, while stating "que pedo," a term that translates to "what's up." *Id*. The above-mentioned actions of Petitioner caused JV1 to stumble and fall down while he was exiting the bathroom. Biswas Decl. ¶ 39; Ex. A. On that date, ICE referred Petitioner to ORR's

---

[1] Unless otherwise noted, exhibits referenced as "Ex. __" refer to the exhibits to the government's Return to Habeas Petition, filed herewith.

2

care following his criminal arrest. Biswas Decl. ¶ 40. On September 22, 2025, Petitioner's legal service provider informed ORR that the Commonwealth of Massachusetts declined to prosecute Petitioner's criminal charge. Biswas Decl. ¶ 49; Ex. A.

On May 15, 2025, Petitioner was admitted to ORR custody and placed at Children's Village under a heighted supervision level of care, given the pending criminal charges against him, pursuant to 45 C.F.R. § 410.1105(a)(3)(i). Biswas Decl. ¶ 40. On that date, Petitioner's father was identified as a potential Category 1 sponsor and ORR case manager had an initial telephone call with Petitioner's father, during which the sponsorship vetting process was explained. Biswas Decl. ¶ 42. On May 22, 2025, Petitioner's father submitted supporting documentation as part of the vetting process, including a copy of his driver's license. Biswas Decl. ¶ 43.  Later in May 2025, J.S.P.A.'s father submitted birth certificates and proof of address. *Id*. On May 28, 2025, ORR completed a public records check of Petitioner's father, and he was scheduled for fingerprinting. On May 29, 2025, fingerprinting was completed and the results were negative. Biswas Decl. ¶ 44.

On June 15, 2025, as a part of the 30-day review pursuant to 45 C.F.R. § 410.1103(d), ORR placed Petitioner on a lower level of supervision at Children's Village, based on the information known by ORR at that time, including Petitioner's statement to his case manager on May 16, 2025, that "he was not directly involved, but assumed to be associated to presence at the scene" at Chelsea High School on May 14, 2025.  Biswas Decl. ¶ 47. On June 15, 2025, Petitioner was admitted to a shelter-level program, and to date, Petitioner remains at a shelter-level program. Biswas Decl. ¶ 48.

3

### C.    Petitioner's Behavioral Incidents at ORR

While in ORR custody, Petitioner has demonstrated a series of behavioral incidents at ORR. Biswas Decl. ¶ 50; Ex. B (Child Level Event Incident Reports).[2]

On June 10, 2025, Petitioner had a verbal altercation with a peer while playing pool where he attempted to strike a peer. Biswas Decl. ¶ 48; Ex. B.

On August 29, 2025, Petitioner initiated a physical altercation by lunging at another UAC, and Petitioner and the other UAC hit each other. Biswas Decl. ¶ 52; Ex. B.

On October 31, 2025, Petitioner made threatening gestures towards a peer through the window.   Biswas Decl. ¶ 53; Ex. B; Staff redirected Petitioner away from the window. *Id.* Petitioner asked a staff member if he could use the restroom, to which he was told that he needed to wait due to safety reasons.  Petitioner responded, "[y]ou whore, I told you to take me to the bathroom." *Id.*

On December 28, 2025, Petitioner was in the bathroom at Children's Village with a peer from approximately 2 A.M. until 3 A.M. Biswas Decl. ¶ 54. Petitioner stated to staff that he received an ear piercing while he was in the bathroom during that time. *Id.* Staff redirected Petitioner to return to his bedroom to comply with the sleeping-time expectations, and Petitioner refused. *Id.*

On January 31, 2026, while waiting for a transport van, staff at Catholic Guardian University Residence Shelter heard Petitioner say to a peer, "look we can escape from here." Biswas Decl. ¶ 56; Ex. B.

---

[2] A Child Level Event incident report is prepared to document "[i]ncidents, events, or observations that affect the health, safety, and wellbeing of individual children and include emergency incidents, significant incidents, behavioral notes, and historical disclosures." ORR UACB Policy Guide: Guide to Terms. Biswas Decl. ¶ 50.

On February 1, 2026, Petitioner stated to his assigned mental health clinician at Catholic Guardian University Residence Shelter, "[t]he staff [at Children's Village] were afraid of me, and I could get whatever I wanted from them" and ". . . I worked things for my benefit.  When I wanted staff to do something for me, I blackmailed them with their jobs."  Petitioner further stated, "I would tell the staff: your job or my marijuana, and they would get me marijuana because I knew things about their lives that could harm their jobs," and "there were staff who did not get along and I used that to my benefit.  Staff who did not get along with other staff would come and tell me personal things about other staff, and I used that to blackmail them to get what I wanted, like marijuana." Biswas Decl. ¶ 57; Ex. B.

On  February 1, 2026, Petitioner stated to his assigned mental health clinician  in reference to the incident that occurred on  May 14, 2025, at Chelsea High School: ". . . I had the intention of killing that guy at school.  He survived because he escaped from the hands of my other friend." Petitioner further explained, "[t]he guy owed me, and whoever does something pays for it.  He survived because he struggled, broke free, and ran out of the bathroom, and when I went to stab him with the knife, my friend did not hold him well." Biswas Decl. ¶ 58; Ex. B. Petitioner also stated: "[t]hen I left the bathroom and put the knife where no one could or would find it."  Finally, he explained, ". . . I did everything where there were no cameras, that's why they dismissed the case."  The assigned clinician "notified leadership management." *Id*.

On February 9, 2026, Catholic Guardian University Residence Shelter recovered a walkie-talkie from Petitioner during an inspection of his bedroom. Biswas Decl. ¶ 59. The walkie-talkie was property of the school Petitioner attended and he was not permitted to possess it. *Id*. Additionally, staff recovered from Petitioner's bedroom a plastic bag containing $78 United States currency, which was concealed in a bottle of conditioner. *Id*.

5

On February 16, 2026, Petitioner engaged in a verbal dispute with an ORR peer. and stated to the peer: "[s]top messing around, what you really want is to get your ass kicked." Biswas Decl. ¶ 60.

**D.    ORR's Decision to Deny Release**

Petitioner's behavioral incidents from June 2025 to February 2026 contributed to ORR's decision to deny release. Biswas Decl. ¶ 61.

In compliance with the updated policies set forth in the UACB Field Guidance that required in person identification verification for sponsorship vetting starting in July 2025, an ORR case manager contacted J.S.P.A.'s father to schedule an appointment for in-person identification verification.   Biswas Decl. ¶ 62. On November 17, 2025, the father declined scheduling an appointment as he did not wish to appear at a Federal building and expressed his desire to withdraw as a potential sponsor. *Id*. To date, J.S.P.A.'s father has not completed the sponsorship requirement of having his identification verified by ORR.  *Id*.

On May 29, 2026, ORR issued a letter denying release of Petitioner to his father because ORR determined that Petitioner posed a risk of danger to himself or the community. Biswas Decl. ¶ 63. ORR's decision was based on the totality of the information available including: information gathered during the reunification process, Petitioner's pattern of physical and verbal aggression at ORR; Petitioner's psychiatric evaluations reflecting continued diagnoses of unspecified adjustment disorder and ongoing mental health symptoms; and Petitioner's criminal arrest on May 14, 2025, and subsequent statements Petitioner made to an ORR clinician regarding the incident. *Id*.

ORR noted in its denial letter issued on May 29, 2026, the danger in releasing Petitioner back into the community where he, based on his own admission, had intended to kill a schoolmate. Biswas Decl. ¶ 64; Ex. C (Notification of Denial Letters). ORR determined that notwithstanding

Petitioner's dismissed criminal charges in Massachusetts, Petitioner's statements to ORR staff regarding the May 14, 2025, criminal arrest, demonstrated deeply troubling thinking and behavior. *Id*. Moreover, ORR determined that Petitioner remained a danger to the community or himself due to his behavioral incidents, and ongoing pattern of aggression towards staff and peers at both Children's Village and Catholic Guardian University Residence Shelter. *Id*. The letter provided Petitioner's father a right to appeal the release denial decision to the Departmental Appeals Board (DAB) under 45 C.F.R. § 410.1205(f). *Id*. A subsequent letter also detailed the right to a risk determination hearing under 45 C.F.R. § 410.1903(b). *Id*; Ex. D (Risk Determination Hearing Notice Packet).

A subsequent Notification of Denial of Release was issued to J.S.P.A. and his legal services provider. Biswas Decl. ¶ 65; Ex. C (Notification of Denial Letter). That notification letter served as a formal notice of the denial of J.S.P.A.'s release. *Id*. It explained that the decision was based on the determination that J.S.P.A. presented a risk of danger to himself or the community. *Id*. The notification informed J.S.P.A. of his right to appeal the release denial to the DAB under 45 C.F.R. § 410.1205(c). *Id*. The letter also informed J.S.P.A. of his right to request a risk determination hearing under 45 C.F.R. § 410.1903(b). *Id*.

To date, neither Petitioner nor his father requested a risk determination hearing pursuant to 45 C.F.R. § 410.1903(b), or an appeal of the release denial to the DAB under 45 C.F.R. § 410.1205(f). Biswas Decl. ¶ 66.

E.     **Petitioner's Habeas Petition**

On July 13, 2026, Petitioner filed this habeas petition seeking immediate release. Pet. ¶ 4.

7

## LEGAL FRAMEWORK

### 1.    Statutory and Regulatory Background

In 2002, Congress enacted the Homeland Security Act of 2002 ("HSA"), Pub. L. No. 107-296, 116 Stat. 2135 (codified in relevant part at 6 U.S.C. § 279), abolishing the Immigration and Naturalization Service ("INS") and transferring the responsibility for the care and placement of UAC from INS to ORR. 6 U.S.C. §§ 279(a), (b)(1)(A), (g)(2).

The HSA defines a UAC as "a child who—(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom— (i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2). Further, it assigns ORR broad authority over the care and custody of UAC while they are in federal custody due to their immigration status, including coordinating their care and placement, ensuring their best interests in custodial decisions and that they are protected from smugglers, traffickers, and others who might seek to victimize and exploit UAC. 6 U.S.C. § 279(b)(1)(A) & (b)(2)(A)(ii). These responsibilities are carried out through cooperative agreements and contracts with care providers under ORR policies and oversight. See 6 U.S.C. § 279(b)(1); 31 U.S.C. § 6305.

Congress enacted the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA") in 2008 to strengthen protections for UAC and support their safe repatriation or appropriate placement. Pub. L. No. 110-457. The statute, consistent with the HSA, makes the Secretary of HHS responsible for the care and custody of UAC. 8 U.S.C. § 1232(b)(1). Pursuant to the TVPRA, "any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to the Secretary of Health and Human Services not later than 72 hours after determining that such child is an unaccompanied alien child." 8 U.S.C. § 1232(b)(3). Further, ORR has no ability to refuse a referral when the referring federal

agency transfers custody to it of an individual that the other agency has determined to be a UAC. *See generally* 8 U.S.C. § 1232(b); Biswas Decl. ¶ 6.

The TVPRA also states that HHS, and other agencies, "shall establish policies and programs to ensure that unaccompanied alien children in the United States are protected from traffickers and other persons seeking to victimize or otherwise engage such children in criminal, harmful, or exploitative activity." 8 U.S.C. § 1232(c)(1). It also provides that UAC "may not be placed with a person or entity unless the Secretary of Health and Human Services makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being." 8 U.S.C. § 1232(c)(3)(A); Biswas Decl. ¶ 11. This safety and suitability determination must "at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." *Id.* Thus, the TVPRA is explicit that ORR must prioritize the safety and well-being of UAC while in its care and upon release.

### 2.        The Unaccompanied Children Program Foundational Rule

In April 2024, ORR promulgated the Unaccompanied Children Program Foundational Rule, codified at 45 C.F.R. Part 410, to establish comprehensive regulations governing its UAC program consistent with its statutory responsibilities. The Foundational Rule also implements provisions of the Flores Settlement Agreement ("FSA") relevant to ORR's care and custody of UAC and conditionally and partially terminated the FSA as to ORR in June 2024. Biswas Decl. ¶ 12. Effective July 1, 2024, the Foundational Rule codified in regulation standards and practices that were previously described in ORR policies.

Specifically, the Rule provides that ORR must release UAC from its custody "[s]ubject to an assessment of sponsor suitability," 45 C.F.R. § 410.1201, a process which starts with an "application package" that "[p]otential sponsors shall complete." *Id*. at 16; 45 C.F.R.

§ 410.1202(a). The assessment of sponsor suitability includes "review of the potential sponsor's application package, including verification of the potential sponsor's identity, physical environment of the sponsor's home, and relationship to the unaccompanied child, if any, and an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the unaccompanied. § 410.1202(b). Biswas Decl. ¶ 16. The sponsor must provide unexpired government-issued identification documentation for the sponsor and any other adults living in the household or identified in a sponsor care plan; and, along with any adult living in his or her household, undergo background checks. UACB Policy Guide §§ 2.2.4, 2.5. Biswas Decl. ¶ 16. The Rule reinforces congressional intent articulated in the HSA and TVPRA that HHS ensure UAC protection from human traffickers and release UAC only to those sponsors capable of protecting their well-being. 45 C.F.R. § 410.1003; *see* Biswas Decl. ¶¶ 15-16.

Moreover, the Rule requires ORR to consider the UAC's "current functioning and strengths in conjunction with any risks or concerns," including history or risk of being a victim of sex or labor trafficking and history of involvement in the criminal or juvenile justice system. 45 C.F.R. § 410.1202(f).  *see* Biswas Decl. ¶¶ 13.

### 3.    ORR's Release to Sponsor Policies and Practices

To carry out its statutory and regulatory mandate under the HSA and TVPRA, and the Foundational Rule, ORR has developed policies and procedures for identifying and conducting suitability assessments of potential sponsors. These procedures are generally set out in ORR's publicly available UACB Bureau Policy Guide ("UACB Policy Guide"). *See* UACB Policy Guide, available at https://perma.cc/Q2C3-3SC5 (last visited July 23, 2026); *see also* Biswas Decl. ¶¶ 14–18 (discussing the relevant UACB Policy Guide Sections). A full assessment of a potential sponsor's suitability is particularly appropriate because ORR is not a law or immigration enforcement agency and lacks the authority to hold individuals accountable by reassuming care if

10

the sponsor abuses or neglects a child after a UAC has been released from ORR custody. Biswas Decl. ¶ 14. Rather, ORR only takes children into its custody upon referral by another federal agency, as described in 8 U.S.C. § 1232(b). *Id.* ¶¶ 6-7. In this regard, ORR is also very different from state child welfare agencies, which typically retain such authority post-placement. *Id.* ¶ 14. Accordingly, ORR must front-load child safety considerations in its identity verification and sponsor vetting policies. *Id.* In light of ORR's obligation to protect UAC from smugglers, traffickers, and others who may seek to victimize them, "safe and timely release . . . involves several steps, including: the identification of sponsors; sponsor application; interviews; the assessment (evaluation) of sponsor suitability, including verification of the sponsor's identity and relationship to the child (if any), background checks, and in some cases home studies; and post-release planning." UACB Policy Guide § 2.1.

ORR conducts suitability assessments of any potential sponsor (with the assistance of a care provider), including a review of the potential sponsor's strengths, resources, risk factors, and special concerns within the context of each child's needs, strengths, risk factors, and relationship to the sponsor. *Id.* §§ 2.2.2, 2.4. A potential sponsor must complete a sponsorship application package, provide unexpired government-issued identification documentation for the sponsor and any other adults living in the household or identified in a sponsor care plan, and, along with any adult living in his or her household, undergo a background check. *Id.* §§ 2.2.4, 2.5. All potential sponsors must also submit proof of address, income, sponsor-child relationship, individual taxpayer identification number or social security number, and criminal history documents (if applicable). *Id.* § 2.2.4. Additionally, in certain circumstances, a home study, which consists of interviews, a home visit, and a written report containing the home-study case worker's findings, is performed. *Id.* § 2.4.2.

### 4.    Updated ORR Guidance Regarding UAC Sponsor Vetting in 2025

On February 4, 2025, former Acting Director of ORR Mellissa Harper issued a memorandum outlining immediate changes to address ongoing concerns with gaps in ORR's sponsor vetting process, as well as fraud and trafficking. Biswas Decl. ¶ 22. In response, on February 14, 2025, ORR issued Field Guidance 26, which requires all potential sponsors, their adult household members aged 18 and above, and all adult caregivers identified in a Sponsor Care Plan to undergo national fingerprint-based FBI background checks. *Id.* ¶ 23. Field Guidance 26 also requires the use of only unexpired and legible photocopies or high-resolution digital scans/photos of identification documents to establish identity. *Id.* These updates to the guidance for vetting potential sponsors directly support ORR's efforts to combat sponsor fraud and mitigate risk of human trafficking of UAC by: requiring the same identity document be used as part of the sponsorship application, the fingerprint application, and at discharge; ensuring validation of acceptable identity documents; and re-establishing universal FBI fingerprints for all sponsors. *Id.*

To further address identified gaps in the sponsor vetting process, ORR updated its UACB Policy Guide Sections 2.2.4 (concerning required supporting documents for sponsor applications to include unexpired identity documents and proof of income), 2.7.4 (concerning lack of fingerprinting and proof of income as bases for denial of release requests), and 5.8.2 (concerning fraud reporting). Biswas Decl. ¶ 24. As to identity documents, ORR made these updates to align the acceptable identity documents for identity verification purposes with the standards used for I-9 verifications as a safer framework than reliance on foreign-issued identity documents. Biswas Decl. ¶ 24. ORR has encountered difficulties authenticating foreign-issued documents and is aware of widespread fraud involving the use of such documents. *Id.* ¶ 25. In consideration of family reunification, the policies contemplate an exception for Category 1 sponsors (who are parents or legal guardians) on a case-by-case basis. *Id.*

With regard to proof of address documentation (UACB Policy Guide § 2.2.4), ORR has previously released children to addresses that did not include apartment numbers or were themselves suspected to be fraudulent, resulting in children released to locations that may not have been actual residences or for which the specific residential unit is unknown. Biswas Decl. ¶ 25. As to sponsor denial criteria (UACB Policy Guide § 2.7.4), ORR clarified that a sponsor's or adult household member's refusal to present for fingerprinting would be sufficient for denial of release because failure to present can be an indication that the individual is trying to conceal known biometrics or criminal history, which could be grounds for sponsorship denial. *Id.*

As part of the sponsor vetting process, "[i]n-person vetting is conducted to verify the potential Sponsor's identity, validate sponsor application supporting documentation, gather additional information to inform the Sponsor Assessment, and confirm the validity of information provided during earlier stages in the sponsor vetting process." UACB Field Guidance ("UACB Field Guidance"), 24, *available at* https://acf.gov/orr/policy-guidance/uc-program-field-guidance (last visited July 24, 2026); Biswas Decl. ¶ 26.

### 5. Return of Previously Released UAC to ORR Custody

The HSA, the TVPRA, and the Foundational Rule do not provide different procedures for UAC who are re-referred to ORR after previously being in ORR custody and released to a sponsor. ORR currently does not have a re-referral policy for children who are referred again to ORR by DHS after a previous release. Biswas Decl. ¶ 35. ORR applies the same requirements (as described in regulations and sub-regulatory guidance) to release for all UAC in its custody, including to the named plaintiff in this litigation. Thus, the applicable policies for re-referrals are contained within 45 C.F.R. §§ 410.1200-410.1210; *Id.*

13

### 6.   Denial Appeal Process

Once the assessment of the potential sponsor is complete, the care provider makes a release recommendation. *Id.* § 2.7. 8 U.S.C. § 1232(c)(2) requires ORR to make certain determinations regarding UACs in its custody. *Mendez Ramirez v. Decker*, 612 F. Supp. 3d 200, 206 (S.D.N.Y. 2020). Under Section 1232(c)(2)(A), "an unaccompanied alien child in the custody of the Secretary of Health and Human Services shall be promptly placed in the least restrictive setting that is in the best interest of the child. In making such placements, the Secretary may consider danger to self, danger to the community, and risk of flight." *Id.* § 1232(c)(2)(A). "The 'least restrictive setting' for the placement of a UAC can include releasing the UAC to live with a sponsor pursuant to a Sponsor Care Agreement, although ORR 'may not' place a UAC 'with a person or entity' until it has made 'a determination that the proposed custodian is capable of providing for the child's physical and mental well-being.'" *Mendez Ramirez*, 612 F. Supp. 3d at 206 (citing § 1232(c)(3)(A)).

ORR makes the final release decision. *Id.* Release decisions include: (1) approve release to sponsor; (2) approve release with post-release services; (3) conduct a home study before a final release decision; (4) deny release; or (5) remand for further information. Biswas Decl. ¶ 27. ORR denies release if: (1) the potential sponsor is not willing or able to provide for the child's physical or mental well-being; (2) the potential sponsor is not willing to complete the mandatory fingerprint check; (3) the physical environment of the home presents a risk to the child's safety or well-being; or (4) release of the UAC would present a risk to him or herself, the sponsor, household, or community. *Id.* ¶ 29; § 2.7.4. If ORR denies the application of a parent, legal guardian, or close relative potential sponsor, the denied potential sponsor may appeal that decision through a detailed administrative process. 45 C.F.R. § 410.1206; Biswas Decl. ¶ 33.

14

Consistent with the Foundational Rule, ORR policy requires that, if ORR denies a sponsor application of a parent, legal guardian, or close relative, the ORR Director, or their neutral and detached designee must send the potential sponsor a Notification of Denial Letter, after receiving all the required information and documentation in a specific case. ORR UACB Policy Guide, Section 2.7.7 (Notification of Denial). If the sole reason for denial of release is related to a concern that the UAC is a danger to themselves or the community, the ORR Director sends to the child and their attorney of record a copy of the Notification of Denial Letter that was sent to the potential Category 1 or 2 potential sponsor.[3] If ORR denies sponsorship to a potential Category 3 potential sponsor,[4] the care provider notifies the potential sponsor, providing the reasons for the denial verbally. If the sole reason for denial of release is a concern that the UAC is a danger to themselves or the community, the ORR Director or their neutral and detached designee sends a Notification of Denial Letter to the child as described above.

A UAC may seek an appeal of the release denial, provided that the Category 1 or 2 potential sponsor (as applicable) is not seeking an appeal. *Id.* If the child expresses a desire to seek an appeal, ORR encourages the child to consult with their attorney of record or a legal service provider for assistance with the appeal. A UAC may seek such an appeal at any time after denial of release while the child is in ORR custody. *Id.*

---

[3] Category 1: Parent or legal guardian. This includes qualifying stepparents that have legal or joint custody of the child or teen. Category 2: A brother; sister; grandparent or other immediate relatives (e.g., aunt, uncle, first cousin). This includes biological relatives, relatives through legal marriage, and half-siblings. UACB Policy Guide section 2.2.1 available at https://acf.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-2.2.1.

[4] Category 3: Other sponsor, such as distant relatives, unrelated adult individuals, or an institutional/organizational Sponsor. ORR UACB Policy Guide, Section 2.2.1 (Identification of Qualified Sponsors). UACB Policy Guide section 2.2.1 available at https://acf.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-2.2.1.

15

In deciding an appeal of a release denial, the Departmental Appeal Board's ("DAB's") role (as the Assistant Secretary's neutral and detached designee who was not involved in the denial decision) is not to substitute its judgment for that of ORR, but to determine whether ORR acted within its statutory authority and applied its regulations and policies reasonably, and whether its decision to deny the Petitioner sponsorship of the UAC was supported by substantial evidence. *See* 45 C.F.R. § 410.1206; UACB Policy Guide § 2.7.4.

The burden of proof is on the Petitioner to demonstrate that ORR's decision to deny release was not based on substantial evidence, and the standard that the DAB is to apply is a preponderance of the evidence. *See Lucas R v. Becerra*, No. CV 18-5741-DMG (PLAx), 2022 WL 2177454, at *28 (C.D. Cal. Mar. 11, 2022) ("The Court will not require the case management team to determine that a sponsor is suitable by a clear and convincing evidentiary standard . . . Due process does not demand that the Court impose procedures that shift the burden to ORR to prove that the sponsor is unfit. Instead, a minor's rights are adequately protected so long as the minor and sponsor have the opportunity to appeal a denial and submit additional evidence of a sponsor's fitness, if necessary.").

The DAB's decision to affirm or overrule ORR's decision to deny release to a potential sponsor is the final administrative decision of the agency on the application that had been under consideration. UACB Policy Guide § 2.7.8. However, if there is new information or a change in circumstances regarding the reunification application, or regarding the unaccompanied alien child's circumstances, a new reunification application may be submitted that highlights the change(s) and explains why such changes should alter the initial decision. *Id*. Similarly, if ORR discovers new information or becomes aware of a change in the circumstances of the potential sponsor and/or the unaccompanied alien child, ORR may assess the case anew. *Id*.

16

**ARGUMENT**

**I.    Petitioner Should be Required to Exhaust His Administrative Remedies that the Departmental Appeal Board ("DAB") Provides**

Petitioner should be required to exhaust his administrative remedies with the DAB before seeking relief here. "A habeas petitioner must normally exhaust administrative remedies before seeking federal court intervention." *Michalski v. Decker*, 279 F. Supp. 3d 487, 495 (S.D.N.Y. 2018). "While § 2241 does not include a statutory exhaustion requirement, district courts in this Circuit have recognized such a requirement as a prudential matter 'before immigration detention may be challenged in federal court by a writ of habeas corpus.'" *Id.* (quoting *Paz Nativi v. Shanahan*, No. 16 Civ. 8496 (JPO), 2017 WL 281751, at *1 (S.D.N.Y. Jan. 23, 2017)) (collecting habeas cases involving a pending BIA appeal of a bond determination that imposed a prudential exhaustion requirement). *See also Imon v. Keeton*, No. 20 Civ. 00037 (PHX) (DWL) (JZB), 2020 WL 4284378, at *11, n.12 (D. Ariz. July 27, 2020) ("Although '[t]he exhaustion requirement is prudential, rather than jurisdictional, for habeas claims,' it makes sense to require exhaustion here because a redetermination request could obviate the need for habeas corpus intervention.") (internal citations omitted); *But see Maldonado v. Lloyd*, No. 18 Civ. 3089 (JFK), 2018 WL 2089348, at *10 (S.D.N.Y. May 4, 2018) (finding that the petitioner raised "substantial constitutional question" under the Fifth Amendment and therefore "the Court will not require exhaustion"); *E.F.E.L. v. Noem*, 26 Civ. 02507, 2026 WL 1045550, *5 (N.D. Ill. Apr. 17, 2026) (rejecting that exhaustion precluded judicial review of UAC habeas petition); *A.N.P.S. v. Salazar*, No. 25 Civ. 14778, 2025 WL 3707333, at *6 (N.D. Ill. Dec. 22, 2025) (declining to require UAC who was re-detained in ORR custody to exhaust administrative remedies).

Where the exhaustion requirement is "judicially imposed instead of statutorily imposed," certain exceptions permit courts to excuse a party's failure to exhaust administrative remedies,

17

including when: "(1) available remedies provide no genuine opportunity for adequate relief; (2) irreparable injury may occur without immediate judicial relief; (3) administrative appeal would be futile; and (4) in certain instances a plaintiff has raised a substantial constitutional question." *Beharry v. Ashcroft*, 329 F.3d 51, 62 (2d Cir. 2003) (internal quotation marks omitted).  However, "[e]xhaustion is the rule, waiver the exception." *Abbey v. Sullivan*, 978 F.2d 37, 44 (2d Cir. 1992). These exceptions do not apply here, where Petitioner has access to a risk determination hearing before an HHS hearing officer, and request an appeal of the denial to the DAB. *See* 45 C.F.R. § 410.1903; 45 C.F.R. § 410.1205(c)(3); *see* Biswas Decl. ¶ 29.

Petitioner's habeas petition is premature in light of the process available to him. On May 29, 2026, in compliance with 45 C.F.R. § 410.1205(f), ORR provided Petitioner and counsel with a copy of the Notification of Denial, which states that ORR denied Petitioner's release because he demonstrated a danger to himself and the community. 8 U.S.C. § 1232(c)(2)(A).  See Ex. C (Denial Letter and Notice). ORR also issued a denial letter to Petitioner's father, the potential sponsor, which informed him that he had the right to request an appeal of the denial to the Departmental Appeals Board ("DAB"). 45 C.F.R. § 410.1205(c)(3). To the extent Petitioner disagrees with ORR's custody determination, he can seek a risk determination hearing before an HHS hearing officer, and request an appeal of the denial to the DAB. *See* 45 C.F.R. § 410.1903; 45 C.F.R. § 410.1205(c)(3).

In fact, to date, neither Petitioner nor his father requested a risk determination hearing pursuant to 45 C.F.R. § 410.1903(b), or an appeal of the release denial to the DAB under 45 C.F.R. § 410.1205(f). Bypassing the administrative process would directly undermine the review-process that the HHS Secretary "shall, at a minimum, . . . verif[y] the custodian' identity and relationship

18

to the child, if any, as well as [make] an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child."  8 U.S.C. § 1232(c)(3)(A)

**II.    Petitioner's Denial of Release from ORR Custody Does Not Violate Due Process**

### a.  *ORR's Delay in its Sponsorship Determination Was Due to the Vetting Process Required*

Although Petitioner was previously released to his father, who was his sponsor, ORR requires background checks of all sponsors including sponsors of children re-referred to custody, and the delay is attributable to the nature of the vetting process. *Id*. Petitioner asserts that Petitioner's father has "complied with all sponsorship vetting requirements" and "fulfilled each of the ever-changing requirements presented to him." Pet. ¶¶ 4, 23. While Petitioner's father provided many of the requested documents, Petitioner's father declined scheduling an appointment for identification verification. Biswas Decl. ¶¶ 62-63. Therefore, while the delay in the sponsorship determination was attributable to the lengthy nature of the vetting process, Petitioner's father's declined identification verification appointment could have delayed the process. *But see E.F.E.L.*, 2026 WL 1045550, at *5 ("Respondents do not cite to any authority requiring a new sponsor application every time a UAC reenters ORR custody. That's because there is absolutely nothing in the TVPRA that requires ORR to conduct the *same* evaluation a *second* time for the *same* sponsor.").

### b.  *ORR's Determined that Petitioner Presented a Danger to Himself and the Community*

Furthermore—and most notably—Petitioner was denied release to a sponsor because ORR determined that he posed a danger to himself and the community. Pursuant to 45 C.F.R. § 410.1206(c) and UACB Policy Guide § 2.7.4, ORR must deny release to a sponsor when ORR determines that the UAC poses a danger to themself or to the community. Based on the totality of the information available, ORR determined that Petitioner presents such a risk. First, ORR

concluded that there was a danger in releasing Petitioner back into the community where he, based on his own admission, had intended to kill a schoolmate. Biswas Decl. ¶ 64; Ex. B (Incident Report). Second, ORR determined that notwithstanding Petitioner's dismissed criminal charges in Massachusetts, Petitioner's statements to ORR staff regarding the May 14, 2025 criminal arrest, demonstrated deeply troubling thinking and behavior. Biswas Decl. ¶ 64; Ex. B. Third, ORR determined that Petitioner remained a danger to the community or himself due to his behavioral incidents, and ongoing pattern of aggression towards staff and peers at both Children's Village and Catholic Guardian University Residence Shelter. Biswas Decl. ¶ 64. *See generally* Ex. B. As such, ORR determined that Petitioner continued to present a substantial and credible risk of danger to himself or to the community if released, particularly, Petitioner's threat of killing his classmate demonstrate credible risk of harm to the community that Petitioner would be released to.

The record in this case contains credible, recent, and serious allegations. On May 14, 2025, while released from ORR custody and while living with his father, Petitioner displayed a switchblade and lunged towards two individuals, while in the bathroom at Chelsea High School, located in Massachusetts. Biswas Decl. ¶¶ 39, 40; *See* Ex. A. While this case was ultimately dismissed due to a declined prosecution, ORR fulfilled its responsibilities under the TVPRA, ORR Foundational Rule, and ORR policies, to protect the safety and welfare of all UAC in its custody and the public.

Additionally, Petitioner has demonstrated a series of behavioral incidents while at ORR. On June 10, 2025, Petitioner attempted to strike another UAC. Biswas Decl. ¶ 51; Ex. B. On October 31, 2025, Petitioner made threatening gestures towards a peer, and used profane language towards an ORR staff member. Biswas Decl. ¶ 53; Ex. B. On January 31, 2026, Petitioner stated to a peer: "look we can escape from here" while waiting for a transport van to another facility.

20

Biswas Decl. ¶ 56; Ex. B. Most notably, on February 1, 2026, Petitioner stated to his assigned mental health clinician in reference to the incident that occurred on May 14, 2025: "I had the intention of killing that guy at school.  He survived because he escaped from the hands of my other friend… the guy owed me, and whoever does something pays for it.  He survived because he struggled, broke free, and ran out of the bathroom, and when I went to stab him with the knife, my friend did not hold him well… [t]hen I left the bathroom and put the knife where no one could or would find it… I did everything where there were no cameras, that's why they dismissed the case." Biswas Decl. ¶ 58; Ex. B. On February 16, 2026, Petitioner stated to another UAC, "[s]top messing around, what you really want is to get your ass kicked." Biswas Decl. ¶ 60; Ex. B. These behavior incidents contributed to ORR's decision to deny release. Biswas Decl. ¶ 61.

Therefore, ORR's determination reflected a change in circumstances from when Petitioner was released from ORR custody on September 7, 2024, to when he was re-placed into ORR custody (and while in ORR custody), because Petitioner presented a danger to himself or the community. Biswas Decl. ¶ 63. *See e.g. E.F.E.L*, 2026 WL 1045550, at *5 (finding that Petitioner's rearrest and detention "without showing changed circumstances from his prior release and without a fair hearing" violated due process); *A.N.P.S.*, 2025 WL 3707333, at *5 (citing *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1196 (N.D. Cal. 2017) (finding that the rearrest of the minor petitioner violated his procedural due process rights when they rearrested him and that "ORR must have necessarily determined that each plaintiff was not a danger to himself, his community or a flight risk.")); *Maldonado,* 2018 WL 2089348 at *10 ("[petitioner] never been convicted of any crime nor ever before been arrested").

21

### c.  ORR's Custody Determination Does Not Violate Procedural Due Process

To determine what procedural due process requires, courts consider: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319 at 335 (1976). When applying this framework to the case at hand, the current procedures do not violate Plaintiff's procedural due process rights.

First, Plaintiff's interests are limited by his status as both a child and alien. *Diego N. et al., v. U.S. Dep't of Health and Human Services, et al.*, No. 1:26 Civ. 0577 (CJN), 2026 WL 1179706, at *4 (D.D.C. Apr. 30, 2026); *see also Reno v. Flores*, 507 U.S. 292, 302 (1993) ("Juveniles, unlike adults, are always in some form of custody, and where the custody of the parent or legal guardian fails, the government may . . . either exercise custody itself or appoint someone else to do so.") (internal quotations and citation omitted); *Zadvydas*, 533 U.S. at 718 (Kennedy, J., dissenting) (aliens are entitled to the protections of the due process clause but "are subject to limitations and conditions not applicable to citizens."); *Mathews v. Diaz*, 426 U.S. 67, 79–80 (1976) ("In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens.").

Second, ORR's procedures do not create a risk of erroneous deprivation because they are designed to release Petitioner to his sponsor as soon as ORR can be assured that such release is safe and in Petitioner's best interests. By requesting immediate release through this action, Petitioner seeks to bypass ORR's process for assessing issues of safety and the child's best interest. *See Diego N.,* 26 Civ. 577, at *4 ("The Government is, of course, already providing process of a

22

kind; indeed, Plaintiffs' concern is that the Government is engaged in too much process, and thus that the re-vetting process is taking too long."); *but see E.F.E.L.*, 2026 WL 104550, at *4 (ordering immediate release for a UAC petitioner who re-entered ORR custody, finding "the rearrest and detention of Petitioner, without showing changed circumstances from his prior release and without a fair hearing, is a violation of Petitioner's Due Process rights" and also finding that TVPRA does not require ORR to conduct a reassessment of the UAC's sponsors application); *Maldonado*, 2018 WL 2089348, at *9 (finding that ORR's "suitability determination has been inordinately and inexplicably delayed" when a UAC was re-placed into ORR custody after he was released to a sponsor, noting that the Government failed to present "any changed circumstances that might support a different conclusion" with respect to the suitability of the sponsor previously approved).

Lastly, the Government has a strong interest in protecting the welfare of UACs, as expressed through the provisions of the TVPRA. *See Santosky v. Kramer*, 455 U.S. 745, 766 (1982) ("[T]he State has an urgent interest in the welfare of the child . . . .") (citation and internal quotation marks omitted); *Maldonado*, 2018 WL 2089348, at *10 ("The most obvious Government interests here are protecting the welfare of children and the safety of the public."). The TVPRA mandates vetting, not automatic release. The least restrictive setting must also be "in the best interest of the child." 8 U.S.C. § 1232(c)(2)(A). The TVPRA prohibits ORR from releasing a child to a proposed custodian unless ORR first "makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being," which "shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." 8 U.S.C. § 1232(c)(3)(A); *see* Biswas Decl. ¶ 11. Thus, these vetting procedures serves an important government interest that cannot be set aside without creating a risk

23

to the safety of UACs, and  do not constitute an unconstitutional infringement on the UAC's qualified liberty. 45 C.F.R. § 410.1202(b). The Government's interest is significant because of its determination that Petitioner would present a danger to himself and the community if released. *A.N.P.S*, 2025 WL 3707333, at *5.

### d. Petitioner's Substantive Due Process Claims are Without Merit

Similarly, Petitioner's substantive due process claim lacks merit. It is difficult to overstate the extremely narrow nature of substantive due process analysis under Supreme Court jurisprudence, or the significant burden that Petitioner must carry to demonstrate that ORR's policies run afoul of the same. As the Supreme Court has repeatedly explained, substantive due process only "prevents the government from engaging in conduct that shocks the conscience . . . or interferes with rights implicit in the concept of ordered liberty." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)). In cases challenging executive action, the threshold question is whether the challenged conduct was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 847 n.8. The facts here do not even approach this standard; indeed, ORR is engaged in a release process that is meant to protect Petitioner's well-being, not harm it.

### III.    Petitioner's Continued Detention in ORR Custody Does not Violate the Flores Settlement Agreement

Petitioner argues that his continued detention in ORR custody violates the Flores Settlement Agreement ("FSA"), because that agreement requires that a minor be released "without unnecessary delay" to a parent, legal guardian or other qualified sponsor. Pet. ¶ 39. This argument is unavailing for two reasons: first, the FSA, has been mostly terminated as to HHS.  *See Flores v. Garland*, No. Civ. 854544-DMG (GRx), 2024 WL 3467715 (C.D. Cali. June 28, 2024), at *9 (C.D. Cali. June 28, 2024) (conditionally and partially terminating the FSA as to HHS on the basis of

24

ORR's publication of regulations implementing the Agreement). The few remaining paragraphs of the FSA that still apply to HHS do not pertain to the ORR release processes (e.g., the sponsor vetting processes).

Second, Petitioner has failed to show that the government has violated any provision of the FSA. The FSA provided that "where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, the INS shall release a minor from its custody without unnecessary delay . . . to a parent;" *Flores v. Lynch*, 828 F.3d 898, 903 (9th Cir. 2016). However, the FSA also provides that:

> A positive suitability assessment may be required to release to any individual or program pursuant to Paragraph 14 [of the FSA]. A suitability assessment may include such components as an investigation of the living conditions in which the minor would be placed and the standard of care he would receive, verification of identity and employment of the individuals offering support, interviews of members of the household, and a home visit. Any such assessment should also take into consideration the wishes and concerns of the minor.

Thus, the requirement that ORR must release the petitioner "without delay" must be read with reference to ORR's responsibility for conducting a suitability assessment.[5] Part of that suitability assessment includes verifying the identity of the sponsor, which ORR is currently in the process of doing. Any delay in releasing Petitioner from ORR custody is not "undue" as it has been the result of ORR's ongoing suitability assessment. *See* Biswas Decl. ¶¶ 9-35 (describing steps that ORR has taken to evaluate sponsor's application).

---

[5] The FSA language concerning release "without unnecessary delay" is currently codified in ORR regulations at 45 C.F.R. § 410.1200 and 1201(a). But as mentioned above and discussed here, ORR also has a statutory and regulatory duty to appropriately vet potential sponsors for UAC, including potential sponsors who are parents or legal guardians.

25

IV.    **Petitioner's Administrative Procedure Act and *Accardi* Claims Fail**

To the extent the Petition can also be read to assert a claim under the Administrative Procedure Act, see Pet. ¶¶ 78-84, such a claim fails. The APA permits judicial review of agency action only when, inter alia, "there is no other adequate remedy in a court." 5 U.S.C. § 704. Where an alien's claims for relief "'necessarily imply the invalidity' of their confinement," those claims "must be brought in habeas" and not as APA claims. *See Trump v. J.G.G.*, 604 U.S. 670, 672 (2025).

Further, Section 706(1) of the APA permits a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The Supreme Court has held that a claim under 5 U.S.C. § 706(1) can only proceed where the plaintiff asserts that an agency failed to take a discrete action that the agency is required to take. *Norton v. Southern Utah Wilderness All*, 542 U.S. 55, 64 (2004). Accordingly, an agency's purported delay in acting cannot be unreasonable with respect to action that is not required. *See id*. Here, the TVPRA mandates that ORR release a child only to a sponsor that ORR, in its child welfare experience and judgment, determines will safely care for the UAC. 8 U.S.C. § 1232(c)(3), and pursuant to 45 C.F.R. § 410.1206(c) and UACB Policy Guide § 2.7.4, ORR must deny release to a sponsor when ORR determines that the UAC poses a danger to themself or to the community. Therefore, Petitioner cannot raise an APA claim.

Additionally, Petitioner's claim that under the Foundational Rule, ORR has a non-discretionary duty to promptly place Petitioner in a least restrictive setting that is in his best interests. Pet. ¶ 88.  To state a claim for an *Accardi* violation, Petitioner must plausibly allege that a regulation or procedure "regulate[s] the rights and interests of others" and thus is "controlling upon the agency." *Leslie v. Att'y Gen. of U.S.,* 611 F.3d 171, 175 (3d Cir. 2010) (citing *Columbia*

26

*Broad. Sys., Inc. v. United States*, 316 U.S. 407, 422 (1942)); *see United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954). When an agency regulation "does not protect fundamental constitutional or statutory rights," a violation of the regulation will only warrant judicial relief when there is "a showing of prejudice." *Leslie*, 611 F.3d at 178 (citing *Chong v. INS*, 264 F.3d 378, 389 (3d Cir. 2001)).

Here, ORR has followed applicable laws, policies, and regulations in processing Petitioner's sponsorship applications. These included laws requiring ORR to consider the safety and suitability of any placement. Any *Accardi* claim also fails because the remedy for an *Accardi* violation would be "limited to compelling the agency to abide by" the regulation, which it has done here, not to order release. *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 227 n.44 (D.D.C. 2020). The Court should also deny relief under *Accardi* for Petitioner's claim that ORR "impermissibly delayed Petitioner's release and reunification with his family," and are "holding Petitioner unlawfully in violation of their own regulations and policies." Pet. ¶ 91.

Thus, Petitioner's claims under the APA, TVPRA, and *Accardi* doctrine should also be denied.

**CONCLUSION**

For the foregoing reasons, the Court should deny the petition for a writ of habeas corpus.

27

Dated:   New York, New York
         July 24, 2026

                                   Respectfully submitted,

                                   JAY CLAYTON
                                   United States Attorney for the
                                   Southern District of New York
                                   *Attorney for Respondents*

                        By:    */s/ Erica Silverman*
                                   ERICA SILVERMAN
                                   Assistant United States Attorney
                                   86 Chambers Street, 3rd Floor
                                   New York, New York 10007
                                   Tel.: (212) 637-2696
                                   Erica.Silverman@usdoj.gov

## Certificate of Compliance

Pursuant to Local Civil Rule 7.1(c), the undersigned counsel hereby certifies that this memorandum complies with the word-count limitations of this Court's Local Civil Rules. As measured by the word processing system used to prepare it, and excluding the items set forth in the rule, there are 8,596 words in this memorandum.

                                   /s/ *Erica Silverman*
                                   ERICA SILVERMAN
                                   Assistant United States Attorney